SAMUEL KORNHAUSER, Esq., California Bar No. 083528
LAW OFFICES OF SAMUEL KORNHAUSER
155 Jackson Street, Suite 1807
San Francisco, California 94111
Telephone:     (415) 981-6281
Facsimile:     (415) 981-7616

Attorney for Defendant

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| MMA CAPITAL LLC,<br><br>       Plaintiff,<br><br>    v.<br><br>DYNAMIC LEISURE CORPORATION,<br><br>       Defendant. | **Case No. C 08-0482 MHP**<br><br>**DECLARATION OF DANIEL BRANDANO IN OPPOSITION TO PLAINTIFF'S EX PARTE MOTION FOR TEMPORARY RESTRAINING ORDER (OR PRELIMINARY INJUNCTION)**<br><br>DATE:    February 4, 2008<br><br>TIME:    2:00 PM |

Opp to TRO-DB Decl

LAW OFFICES
SAMUEL KORNHAUSER
155 Jackson Street, Suite 1807
San Francisco, CA 94111

I, Daniel Brandano, declare as follows:

1. I am, and at all times relevant hereto, have been the Chief Executive Officer of Dynamic Leisure Corporation, a Minnesota corporation ("DLC"). I am over the age of 18 and have personal knowledge of the facts set forth herein and if called as a witness, I would be competent to testify to these facts based on my own personal knowledge.

2. DLC is in the business of providing on-line, full service, complete travel packages whereby using DLC's proprietary software. Customers can choose their entire vacation package (hotels, airfare, rental, activities, etc.) on-line and book it in advance through DLC.

3. DLC has invested millions of dollars developing its platforms, vacation programs and proprietary software to allow customers to book their entire vacation packages from the ease of their homes. Investors in DLC, including Trafalgar Capital Specialized Investment Fund, Luxembourg, have informed me that they have invested and continue to invest in DLC because they believe that DLC's proprietary software is worth tens of millions of dollars.

4. As a result of the intensive up-front capital investment to launch its technology, in January 2006, DLC was in need of additional financing to meet its operating and marketing needs.

5. On January 13, 2006, DLC and Plaintiff in this action, MMA, entered into a financing arrangement whereby MMA lent DLC Two Million Dollars evidenced by a secured convertible promissory note. The maturity date for the secured convertible note was January 11, 2007.

6. On or about November 2, 2006, MMA, pursuant to the Security Agreement which secured the note, sent notice to DLC of a claimed default. MMA filed suit in this Court on November 22, 2006 for alleged breach of contract and breach of security agreement.

7. On March 5, 2007, MMA and DLC settled that lawsuit and entered into a Confidential Settlement Agreement whereby MMA extended the maturity date on the promissory note to March 5, 2008 and increased the note to $2.25 million.

8. Significantly, not mentioned in MMA's ex parte moving papers or in its Complaint in this action, is the fact that a major consideration for entering into the settlement was MMA's agreement that it would allow DLC to obtain additional financing from other current or potential

1    investors and that MMA would subordinate its security interest to that of any investor which

2    purchased more than Three Million Dollars of DLC securities. Thus, Section 5 of the

3    Confidential Settlement Agreement provides in pertinent part:

4            The Company [DLC] shall strive to secure new investments in
             securities of [DLC] in an amount sufficient to fund [DLC's]
5            business plan... the parties agree to modify § 6 of the Security
             Agreement to provide that [DLC] may grant a security interest in
6            the Collateral to one or more investors... without MMA's approval
             provided that the security interest demanded by the investors and
7            the security interest granted by [DLC] in the Collateral is...
             superior to the rights granted to MMA by the Security Agreement
8            and the potential investors are purchasers of securities of [DLC] for
             gross proceeds in any form whatsoever of more than Three Million
9            Dollars ($3,000,000 US).

10    A copy of the Settlement Agreement is attached hereto as Exhibit 1.

11        9.    Therefore, pursuant to the terms of the Settlement Agreement, DLC was free to and in

12    fact encouraged by MMA to seek other financing from other investors and MMA would take a

13    subordinate lien position in the Collateral (assets of DLC) to investors who invested more than

14    Three Million Dollars in DLC.

15        10.   On June 29, 2007, Trafalgar invested $2.3 Million in DLC. A copy of the Securities

16    Contract is attached hereto as Exhibit 2.

17        11.   On January 22, 2008, Trafalgar invested an additional $1.2 Million in DLC. A copy of

18    the Securities Purchase Agreement is attached hereto as Exhibit 3.

19        12.   On January 25, 2008, Trafalgar funded the additional $1.2 Million. A copy of the funds

20    transfer is attached hereto as Exhibit 4.

21        13.   By the terms of Section 5 of the Settlement Agreement, MMA has agreed and consented

22    to Trafalgar obtaining a security interest in MMA's Collateral "superior" to that of MMA by

23    virtue of Trafalgar's investment of $3.5 Million in DLC. (Exhibit 1, § 5.)

24        14.   Trafalgar's investment has provided the bridge financing through and beyond

25    March 5, 2008 when MMA's promissory note comes due. Trafalgar's additional financing

26    allows DLC to operate while it attempts to obtain additional financing from Trafalgar or other

27    investors so that DLC can retire MMA's loan and operate its business.

28

15. Trafalgar's Managing Partner, Robert Press, has discussed with me, as part of our negotiations for Trafalgar's recent $1.2 Million investment, his and Trafalgar's intention to seek additional investment in DLC.

16. In light of Section 5 of the Settlement Agreement and MMA's unconditional agreement to allow Trafalgar to obtain a superior security interest in MMA's Collateral, after investing more than $3 Million in DLC, there is no basis for MMA to claim that its Collateral is threatened by Trafalgar's already funded investment. MMA has already agreed to it.

17. Nor have I received or am I aware of MMA even sending DLC a notice of default prior to filing this lawsuit. In fact, MMA has still not served me with a notice of default under its note or the Settlement Agreement.

18. It should also be noted that MMA's alleged basis for claiming a default and filing this action – that DLC "fails to generally pay its debts as they come due" – is not accurate. In fact, the additional $1.2 Million in financing which Trafalgar funded on January 25, 2008, and which MMA sought to enjoin, makes substantial monies available to DLC to allow it to generally pay its debts as they come due. DLC's note to MMA does not come due until March 5, 2008.

19. Mr. Press of Trafalgar has informed me that Trafalgar would not have made the additional $1.2 Million investment if it did not think DLC was a viable company.

20. Finally, when MMA became aware that DLC was seeking additional financing, Gary Armitage of MMA sent me and Mr. Press a term sheet which I and Mr. Press of Trafalgar viewed as an effort by MMA to take control of DLC (for $250,000) by taking control of DLC's Board of Directors so MMA could prevent DLC from entering into the just accomplished financing and to prevent Trafalgar from obtaining the superior security interest which MMA had previously agreed to by its Settlement Agreement with DLC. (A copy of the term sheet is attached as Exhibit C to Mr. Armitage's January 22, 2008 Declaration.)

LAW OFFICES
SAMUEL KORNHAUSER
155 Jackson Street, Suite 1807
San Francisco, CA 94111

1    I declare under penalty of perjury that the foregoing is true and correct except as to

2   statements based on belief and as to those, I believe them to be true and that this declaration

3   was executed by me in Tampa, Florida on January 29, 2008.

4

5

6

7   _____

Daniel Brandano

8

9

10

11

12

13

14

15

16

LAW OFFICES
SAMUEL KORNHAUSER
155 Jackson Street, Suite 1807
San Francisco, CA 94111

17

18

19

20

21

22

23

24

25

26

27

28

OpptoTRO-DBDecl[1]

**PROOF OF SERVICE**

I declare that I am employed in the City and County of San Francisco. I am over the age of eighteen years and not a party to the within cause. My business address is 155 Jackson Street, Suite 1807, San Francisco, CA. On January 29, 2008, I served the within **DECLARATION OF DANIEL BRANDANO IN OPPOSITION TO PLAINTIFF'S EX PARTE MOTION FOR TEMPORARY RESTRAINING ORDER (OR PRELIMINARY INJUNCTION)** on the party below in said cause:

> Michael R. Matthias, Esq.
> John J. Leonard, Esq.
> Baker & Hostetler LLP
> 12100 Wilshire Boulevard, 15th Floor
> Los Angeles, CA 90025-7120

via facsimile and UPS Next Day Air.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on January 29, 2008, at San Francisco, CA.

Donald E Stevens

**EXHIBIT 1**

## CONFIDENTIAL SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement"), dated as of March 5, 2007 ("Effective Date"), is made between MMA Capital, LLC ("MMA") and Dynamic Leisure Corporation, formerly known as Dyneco Corporation, (the "Company"). MMA and the Company are each referred to individually as a "Party" and collectively as the "Parties."

## RECITALS

WHEREAS, the Company issued to MMA a secured convertible promissory note dated January 13, 2006 (the "Note") and Warrant to Purchase Common Stock dated January 13, 2006 (the "First Warrant"). In connection with the issuance of the Note, the Company and MMA entered into that certain Security Agreement dated January 11, 2006 (the "Security Agreement"). In addition, the parties agreed upon a form of Subscription Agreement to be executed and delivered by the parties upon conversion of the Note and/or exercise of the Warrant (the "Subscription Agreement"); and

WHEREAS, the Company and MMA entered into that certain Modification of Secured Convertible Promissory Note, dated August 16, 2006 (the "First Note Modification"); and

WHEREAS, the Company and MMA entered into that certain Second Modification of Secured Convertible Promissory Note dated September 20, 2006 (the "Second Note Modification"), together with that certain Modification of Warrant to Purchase Shares of Common Stock dated September 20, 2006 (the "Warrant Modification"); and

WHEREAS, MMA commenced an action against the Company in the United States District Court for the Northern District of California entitled MMA Capital, LLC v. Dynamic Leisure Corporation, Case No. C 06 7263 CRB ("Action") and in which MMA claims that the Company breached the terms of the Note, Warrant, Security Agreement, First Note Modification, Second Note Modification and Warrant Modification (collectively, the "Loan Agreements");

WHEREAS, the Company denies all of the allegations made by MMA in its pleadings in the Action; and

WHEREAS, without admitting the truthfulness of any allegations made against them, the Parties wish to avoid the cost and uncertainty associated with further litigation and to resolve MMA's claims on the terms set forth below; and

WHEREAS, the Parties do not intend to modify any of the Loan Agreements except as expressly provided for in this Agreement;

THEREFORE, in consideration of the promises in this Agreement, the adequacy of which is acknowledged, the Parties agree as follows:

## AGREEMENT

*CONFIDENTIAL SETTLEMENT AGREEMENT*
*FOR SETTLEMENT PURPOSES ONLY*



LOSANGELES 3319696 70559-00001



1.    Incorporation of Recitals. The foregoing recitals form a material part of this Agreement and are hereby incorporated into this Agreement.

2.    Settlement Benefits.

a.    MMA hereby waives the contract breaches alleged in the Action, specifically that the Company (1) failed to comply with the securities registration requirements set forth in § 3 of the Note, (2) violated § 6 of the Security Agreement by granting, without MMA's express written consent, competing liens against assets pledged by the Company as security for the promises made in the Loan Agreements ("Collateral"), and (3) violated § 6 of the Security Agreement by failing to pay all costs and expenses associated with the filing of any documents necessary for MMA to perfect its security interest in the Collateral. As of the Effective Date, MMA is unaware of any other claim or claims that it may have against the Company. The Parties acknowledge and agree that MMA does not by this Agreement waive or release any past or future claim that it may have against the Company and which is unknown to MMA on the Effective Date.

b.    The Company shall issue to MMA a warrant for 3,000,000 shares of the Company's Common Stock ("Second Warrant") in the form set forth in Exhibit A. The Second Warrant shall have registration rights as set forth in Exhibit B.

c.    Within 72 hours of its receipt of Company-executed copies of this Agreement and the Second Warrant, MMA will dismiss the Action against the Company with prejudice. MMA shall provide the Company with evidence of the Court's entry of such dismissal within ten (10) days of its receipt of such evidence.

3.    Modifications to the Loan Agreements.

a.    Maturity Date of the Note. The Maturity Date of the Note is hereby extended to March 5, 2008.

b.    Registration of the Company's Common Stock. The Company acknowledges that the terms of the Note obligate it to register with the Securities and Exchange Commission ("Commission") any and all securities that are issuable to MMA upon its conversion of the principal and interest of the Note into stock of the Company. The Company agrees that it will register with the Commission any and all securities that are issuable to MMA upon its exercise of the Second Warrant on the terms and conditions set forth in Exhibit B. The Company represents that it has filed a registration statement with the Commission on Form SB-2 on December 18, 2006, Commission File No. 333-139438, seeking to register the securities issuable to MMA upon its conversion of the Note and exercise of the First Warrant (the "MMA Registration Statement"). The Company acknowledges, however, that it has filed and may file other registration statements with the Commission seeking to register securities to be issued to third-parties unrelated to MMA ("Third-Party Registration Statements"), and that Commission approval of the Third-Party Registration Statements may delay the date on which the MMA Registration Statement becomes effective. To ensure that the MMA Registration Statement becomes effective, and to give MMA assurance that the Company will pursue such registration

2



in good faith and that the MMA Registration Statement will become effective in a reasonable time, the Company agrees to the following:

i.    The Company shall use its commercially reasonable efforts to respond to any comments issued by the Staff of the Commission regarding the MMA Registration Statement. The Company shall use its commercially reasonable efforts to issue its response to any such comments to the Commission within ten (10) business days of the Company's receipt of such comments. Such responses shall, if required by the Commission, include the filing of any amendments to the registration statements that are necessary and appropriate, if required by the Commission.

ii.    Within 2 business days of receiving notice from the Commission that the Post-Effective Amendment to Registration Statement (Commission File No. 333-124283) is effective, the Company shall file a prospectus for those securities in compliance with Rule 424 of the SEC Rules and Regulations ("Prospectus"). The Company agrees to file an amendment to the MMA Registration Statement within 3 business days after filing the Prospectus.

iii.    The Company shall not withdraw the MMA Registration Statement without first obtaining written approval from MMA. MMA shall not unreasonably withhold such approval. The Company shall use its commercially reasonable efforts to cause the MMA Registration Statement to become effective.

iv.    After the MMA Registration Statement, as amended, is declared effective by the Commission, the Company shall maintain the effectiveness of the registration statement until the earlier of (i) one year; (ii) the date on which all securities covered by the MMA Registration Statement as amended from time to time, have been sold; or (iii) the date at which all the securities covered by the MMA Registration Statement as amended from time to time, can be sold in any three-month period without registration in compliance with Rule 144 of the Securities Act of 1933, as amended (the "Securities Act"). Notwithstanding the foregoing, for not more than twenty-five (25) consecutive days or for a total of not more than fifty (50) days in any twelve (12) month period, the Company may delay the disclosure of material non-public information concerning the Company, by suspending the use of any prospectus included in any registration contemplated by this Agreement containing such information, the disclosure of which at the time is not, in the good faith opinion of the Company, in the best interests of the Company (an "Allowed Delay"); provided, that the Company shall promptly (a) notify MMA in writing of the existence of (but in no event, without the prior written consent of MMA, shall the Company disclose to MMA any of the facts or circumstances regarding) material non-public information giving rise to an

3

*CONFIDENTIAL SETTLEMENT AGREEMENT*
*FOR SETTLEMENT PURPOSES ONLY*

Allowed Delay. (b) advise MMA in writing to cease all sales under the MMA Registration Statement until the end of the Allowed Delay and (c) use commercially reasonable efforts to terminate an Allowed Delay as promptly as practicable.

v.      The Company shall be bound by its obligations under §§ 3(b)(i) and 3(b)(ii) of this Agreement only until the MMA Registration Statement is declared effective.

4.      Events of Default.  The Company's failure to comply with any of the provisions of this Agreement shall be an event of default ("Event of Default").  If such Event of Default occurs and is not cured within fifteen (15) days after receipt of written notice of such Event of Default by the Company, (a) MMA shall be entitled to nominate one (1) person to the Company's Board of Directors and the Company shall appoint MMA's nominee to its Board of Directors within two (2) days of such nomination.  If the Event of Default is not cured by the Company within fifteen (15) days of MMA's first nomination, MMA shall be entitled to nominate one (1) additional nominee to the Company's Board of Directors and the Company shall appoint such nominee to its Board of Directors within two (2) days of MMA's nomination. The Parties agree that the provisions of this section of the Agreement are intended to supplement the provisions of the Loan Agreements and are not intended to in any way replace or limit the rights or remedies to which MMA is entitled under any of the Loan Agreements.

5.      New Investment.   The Company shall strive to secure new investments in securities of the Company in an amount sufficient to fund the Company's business plans for the twelve months following the effective date of this Agreement ("New Investment").  To facilitate the Company's fundraising efforts, the Parties agree to modify § 6 of the Security Agreement to provide that the Company may grant a security interest in the Collateral to one or more investors in securities of the Company without MMA's approval provided that the security interest is demanded by the investors and the security interest granted by the Company in the Collateral is (1) in pari passu with the rights granted to MMA by the Security Agreement and the potential investors are purchasers of securities of the Company for gross proceeds, in any form whatsoever, of up to Three Million Dollars ($3,000,000 US); or (2) superior to the rights granted to MMA by the Security Agreement and the potential investors are purchasers of securities of the Company for gross proceeds, in any form whatsoever, of more than Three Million Dollars ($3,000,000 US).

6.      Attorneys' Fees and Costs.  The Company shall pay up to $25,000 of the legal fees and expenses incurred by MMA in connection with the Action and the negotiation and drafting of this Agreement.  The Company shall make reimbursement under this section of the Agreement within five (5) days after the later of (i) receipt of gross proceeds of at least $1,000,000 from New Investment and (ii) submission to the Company of an invoice for such attorneys' fees and expenses accompanied by original receipts supporting the reimbursement request.

7.      Reports and Updates.  The Company shall provide MMA with weekly written updates on the status of its securities registration efforts with the Commission.  In addition, if the

4

CONFIDENTIAL SETTLEMENT AGREEMENT
FOR SETTLEMENT PURPOSES ONLY

LOS ANGELES 3319696v6 70559-00001



Company contemplates entering into a convertible debt financing transaction, the conversion price of which is not fixed (subject to anti-dilution adjustments), the Company shall notify MMA that the Company needs to discuss a financing transaction with MMA. MMA will have the sole option to request further information from the Company, which information will not include the specific terms and conditions of such transaction. Such disclosures shall commence being made by the Company to MMA immediately upon the Company's receipt of a Confidentiality and Non-Disclosure Agreement in form and content sufficient to satisfy the Company's obligations under Regulation FD and MMA's obligations under federal and state securities laws, including Rule 10b-5 of the Securities Exchange Act of 1934.

8.    Authorizations.  Each of the Parties and each of the individuals signing this Agreement on behalf of the Parties represents and warrants that the individuals executing this and other documents on behalf of the Parties have the capacity and have been duly authorized to so execute this Agreement on behalf of the Party so indicated. Each Party and each individual signing this Agreement on behalf of the Parties shall also indemnify the other parties to this Agreement, and hold them harmless, for, from and against any and all damages, costs, attorneys' fees, and other expenses, if the respective signatory executing on behalf of such Party is not so authorized.

9.    Warranty and Non-Assignment of Claims.  Each of the Parties agrees, covenants, represents and warrants that he (a) is the sole and lawful owner of all rights, title and interest in and to each and every claim or matter hereby released, and (b) has not heretofore assigned or transferred, or purported to or attempted to assign or transfer, to any person or entity, any claim or other matter herein released. Any Party in breach of this paragraph shall indemnify, defend and hold harmless the other parties hereto from any and all claims arising out of or relating to any assignment or transfer contrary to the terms of this paragraph; and in any event, no assignment or transfer thereof shall be valid or enforceable.

10.    Confidentiality and Non-Disparagement.  The Parties agree to keep the facts and terms of this Agreement in strict confidence, unless and only to the extent that they have been authorized in writing to make such disclosure or unless compelled by law or Court Order. It shall not be a violation of this Agreement for the Parties to disclose this Agreement or its terms to their lawyers, accountants or income tax preparers. This Agreement may be used as evidence in any subsequent proceeding alleging a breach of this Agreement. To the extent that the Parties disclose any of the terms of this Agreement in accordance with this paragraph, they agree to require, and warrant, that any person receiving this information, including, but not limited to, their counsel, shall maintain its confidentiality. The Parties also agree that they will not publicly criticize, denigrate, or otherwise publicly speak adversely against each other.

5

11.    No Admission.  The Parties understand and agree that the Company expressly denies any wrongdoing, liability to, or any responsibility for any injury or loss alleged by MMA in the Action, that this settlement is the compromise of disputed claims, and that the Company's settlement of MMA's claims was made only to avoid the expense, inconvenience, and disruption that would result from continued investigation and litigation.

12.    Severability.  If any portion of this Agreement is void or deemed unenforceable for any reason, the unenforceable portion shall be deemed severed from the remaining portions of this Agreement, which shall otherwise remain in full force.

13.    Applicable Law; Choice of Forum; Consent to Jurisdiction; Venue.  This Agreement shall be interpreted in accordance with California law without regard to its choice of law principles.  The Parties agree that all actions and proceedings arising out of or relating, either directly or indirectly, to this Agreement shall be filed and litigated exclusively in the United States District Court for the Northern District of California.  The Parties expressly consent to the jurisdiction of the United States District Court for the Northern District of California and agree that venue is proper in that court.

14.    Multiple Counterparts.  This Agreement may be executed in two or more counterparts, each of which will be deemed an original, but all of which together shall constitute one and the same instrument.  Faxed copies shall be effective and enforceable as originals.

15.    Captions and Headings.  The captions and headings of this Agreement are for convenience only and have no force and effect in the interpretation or construction of this Agreement.

16.    Assignment of this Agreement.  No Party shall have the right to assign its rights or delegate any of its obligations or duties under this Agreement without the express written consent of all of the other parties.

17.    Successors and Assigns.  Except as restricted herein, this Agreement shall be binding on and shall inure to the benefit of the Parties and their respective legal representatives, successors and assigns.

18.    Waiver.  The waiver of any breach of any provision hereunder by any Party to this Agreement shall not be deemed to be a waiver of any preceding or subsequent breach hereunder, nor shall any waiver constitute a continuing waiver.  No waiver shall be binding unless executed in writing by the Party making the waiver.

19.    No Other Filings.  The Parties represent that they have not initiated any lawsuits or any other proceedings against one another or filed any complaints, charges, or claims against one another with any local, state or federal agency or court or other forum in any capacity whatsoever in connection with any of the claims released by this Agreement, other than the Action.

20.    No Third Party Rights.  Nothing in this Agreement, whether express or implied, is intended to confer any rights or remedies under or by reason of this Agreement on any persons other than the Parties hereto and their respective successors and assigns, nor is anything in this Agreement

6

intended to relieve or discharge the obligations or liability of any third persons to any Party to this Agreement, nor shall any provision give any third persons any right of subrogation or action over or against any Party to this Agreement.

21.    Survival of Representations, Warranties and Covenants. Each of the representations, warranties and covenants and agreements set forth in this Agreement shall survive the execution, delivery and performance of the obligations of and under this Agreement.

22.    Additional Actions. Each Party agrees to do all acts and things to make, execute and deliver such written instruments and documents, as shall from time to time, be reasonably necessary to carry out the terms, provisions and intentions of this Agreement.

23.    Entire Agreement and Amendment. The Parties acknowledge that this Agreement constitutes the entire agreement of the Parties and that, in executing this Agreement, they do not rely and have not relied upon any representation or statement not set forth herein with regard to the subject matter, basis, or effect of this Agreement. This Agreement may be altered, amended or modified only by an instrument in writing, executed by the Parties to this Agreement and by no other means. Each Party waives its right to claim, contest or assert that this Agreement was modified, canceled, superseded or changed by any oral agreement, course of conduct, waiver or estoppel. The Parties represent that before executing this Agreement, they have consulted with competent legal counsel of their own choosing, have carefully read the Agreement, and have been fully and fairly advised as to its terms. The Parties further represent and warrant that they have been given adequate time to consider this Agreement before executing it and that they execute this Agreement as their own free act and deed.

WHEREFORE, the Parties, by their signatures below, acknowledge that there exist no other promises, representations, or agreements relating to this settlement, except as specifically set forth herein and that they voluntarily enter into this Agreement with the intent to be legally bound thereby.

MMA CAPITAL, LLC

*CONFIDENTIAL SETTLEMENT AGREEMENT*
*FOR SETTLEMENT PURPOSES ONLY*

LOS ANGELES 331969v6 70559-00001

By: GARY F ARMITAGE
Its: MANAGING MEMBER

DATE: ___3 / 5___ , 2007

REVIEWED AND APPROVED AS TO FORM:
BAKER & HOSTETLER LLP


_____
JOHN J. LEONARD

DATE: _____ , 2007


DYNAMIC LEISURE CORPORATION

By: DANIEL G. BRANDANO
Its: PRESIDENT & C.E.O

DATE: __3/6/07__ , 2007

REVIEWED AND APPROVED AS TO FORM:
CRONE ROZYNKO, LLP


_____
ALISANDE M. ROZYNKO

DATE: _____ , 2007


8

*CONFIDENTIAL SETTLEMENT AGREEMENT
FOR SETTLEMENT PURPOSES ONLY*

LOS ANGELES 131969v6 70559-00001

EXHIBIT B

REGISTRATION RIGHTS

(a)    Mandatory Registration.  The Company agrees to file with the Commission a registration statement under the Securities Act (the Second Warrant Registration Statement") covering the registration of Common Stock eligible for issuance upon the exercise of the Second Warrant (the "Second Warrant Shares") within thirty (30) days after the MMA Registration Statement has been declared effective. to effect the registration of such Common Stock under the Securities Act. The Company shall use its commercially reasonable efforts to cause the Second Warrant Registration Statement to be declared effective within one hundred eighty (180) days thereafter and agrees to use its commercially reasonably efforts to keep the Second Warrant Registration Statement effective for a period until the earlier of (i) one year; (ii) the date on which all securities covered by the Second Warrant Registration Statement as amended from time to time. have been sold; or (iii) the date at which all the securities covered by the Second Warrant Registration Statement as amended from time to time. can be sold in any three-month period without registration in compliance with Rule 144 of the Securities Act (the "Registration Period"). Notwithstanding the foregoing, for not more than twenty-five (25) consecutive days or for a total of not more than fifty (50) days in any twelve (12) month period, the Company may delay the disclosure of material non-public information concerning the Company. by suspending the use of any prospectus included in the Second Warrant Registration Statement containing such information. the disclosure of which at the time is not. in the good faith opinion of the Company. in the best interests of the Company (an "Allowed Delay"); provided, that the Company shall promptly (a) notify MMA in writing of the existence of (but in no event, without the prior written consent of MMA, shall the Company disclose to MMA any of the facts or circumstances regarding) material non-public information giving rise to an Allowed Delay. (b) advise MMA in writing to cease all sales under the Second Warrant Registration Statement until the end of the Allowed Delay and (c) use commercially reasonable efforts to terminate an Allowed Delay as promptly as practicable.

The Company's failure to comply with the foregoing shall be deemed an Event of Default under this Agreement provided. however. that in the event the Commission requires a reduction in the number of shares to be registered. based primarily upon the limitations imposed by Rule 415 of the Securities Act. the Company shall use its commercially reasonable efforts to register as many shares of Common Stock as is practicable and. in such event. no Event of Default shall be deemed to have occurred as a result of the reduction in the number of shares registered. All expenses incurred in connection with the registration of the Second Warrant Shares. including without limitation all registration and qualification fees. accounting fees. fees and disbursements of counsel for the Company. and reasonable fees and expenses of a single special counsel for the Holder. up to a maximum of $25,000. will be borne by the Company.

(b)    Piggyback Registration Rights.  If at any time prior to the expiration of the Registration Period the Company shall determine to file with the Commission a registration statement relating to an offering for its own account or the account of others under the Securities Act of any of its equity securities (other than on Form S-4 or Form S-8 or their then equivalents relating to equity

9

CONFIDENTIAL SETTLEMENT AGREEMENT
FOR SETTLEMENT PURPOSES ONLY

securities to be issued solely in connection with any acquisition of any entity or business or equity securities issuable in connection with stock option or other bona fide, employee benefit plans), the Company shall send to MMA written notice of such determination and, if within fifteen (15) days after the effective date of such notice, MMA shall so request in writing, the Company shall include in such registration statement all or any part of the Second Warrant Shares that MMA requests to be registered, except that if, in connection with any underwritten public offering for the account of the Company the managing underwriter(s) thereof shall impose a limitation on the number of shares of Common Stock which may be included in the registration statement because, in such underwriter(s)' judgment, marketing or other factors dictate such limitation is necessary to facilitate public distribution, then the Company shall be obligated to include in such registration statement only such limited portion of the Second Warrant Shares with respect to which MMA has requested inclusion hereunder as the underwriter shall permit. Any exclusion of Second Warrant Shares shall be made pro rata with holders of other securities having the right to include such securities in the registration statement other than holders of securities entitled to inclusion of their securities in such registration statement by reason of demand registration rights; provided, however, that the Company shall not exclude any Second Warrant Shares unless the Company has first excluded all outstanding securities, the holders of which are not entitled to inclusion of such securities in such registration statement. If an offering in connection with which MMA is entitled to registration under this Section (b) is an underwritten offering, then MMA shall, unless otherwise agreed by the Company, offer and sell such registrable securities in an underwritten offering using the same underwriter or underwriters and, subject to the provisions of this Agreement, on the same terms and conditions as other shares of Common Stock included in such underwritten offering. Notwithstanding anything to the contrary set forth herein, the registration rights of MMA pursuant to this Section (b) shall only be available in the event the Company fails to timely file, obtain effectiveness or maintain effectiveness of any registration statement to be filed pursuant to Section (a) in accordance with the terms of this Agreement.

*CONFIDENTIAL SETTLEMENT AGREEMENT*
*FOR SETTLEMENT PURPOSES ONLY*

LOSANGELES 331969v6 70559-00001

**EXHIBIT 2**

## SECURITIES PURCHASE AGREEMENT

**THIS SECURITIES PURCHASE AGREEMENT** (this "Agreement"), dated as of June 29, 2007, by and among Dynamic Leisure, Corporation, a Minnesota corporation, with headquarters located at 5680 West Cypress Street, Tampa, FL 33607 (the "Company"), and the Buyers listed on Schedule I attached hereto (individually, a "Buyer" or collectively "Buyers").

### WITNESSETH:

**WHEREAS,** the Company and the Buyer(s) are executing and delivering this Agreement in reliance upon an exemption from securities registration pursuant to Section 4(2) and/or Rule 506 of Regulation D ("Regulation D") as promulgated by the U.S. Securities and Exchange Commission (the "SEC") under the Securities Act of 1933, as amended (the "1933 Act");

**WHEREAS,** the parties desire that, upon the terms and subject to the conditions contained herein, the Company shall issue and sell to the Buyer(s), as provided herein, and the Buyer(s) shall purchase up to Two Million Four Hundred Thousand Dollars ($2,400,000) of secured convertible debentures (the "Convertible Debentures"), which shall be convertible into shares of the Company's common stock, par value $.01 (the "Common Stock") (as converted, the "Conversion Shares") of which Seven Hundred Thousand Dollars ($700,000) shall be funded on the date hereof (the "First Closing"), Four Hundred Thousand Dollars ($400,000) shall be funded on the date the registration statement (the "Registration Statement") is filed, pursuant to the Investor Registration Rights Agreement dated the date hereof, with the United States Securities and Exchange Commission (the "SEC") (the "Registration Closing") and the balance to be funded upon the earlier to occur of the closing of a transaction by the Company to redeem its promissory note held by NIR or the SEC declaring the Registration Statement Effective (the "NIR Closing") (each individually referred to as a "Closing" collectively referred to as the "Closings"), for a total purchase price of up to Two Million Four Hundred Thousand Dollars ($2,400,000), (the "Purchase Price") in the respective amounts set forth opposite each Buyer(s) name on Schedule I (the "Subscription Amount"); and

**WHEREAS,** the obligation of the Buyers to purchase Convertible Debentures in the Registration closing or the NIR Closing is subject to the Company showing evidence satisfactory to the Buyers of additional investments of at least $600,000 and a transference of the existing Senior lien to the Buyers; and

**WHEREAS,** contemporaneously with the execution and delivery of this Agreement, the parties hereto are executing and delivering a Registration Rights Agreement substantially in the form attached hereto as Exhibit A (the "Investor Registration Rights Agreement") pursuant to which the Company has agreed to provide certain registration rights under the 1933 Act and the rules and regulations promulgated there under, and applicable state securities laws; and

**WHEREAS,** the aggregate proceeds of the sale of the Convertible Debentures contemplated hereby shall be held in escrow pursuant to the terms of an escrow agreement substantially in the form of the Escrow Agreement attached hereto as Exhibit B; and

**IN WITNESS WHEREOF**, the Buyers and the Company have caused this Securities Purchase Agreement to be duly executed as of the date first written above.

**COMPANY:**
**DYNAMIC LEISURE CORPORATION**

By:_____
Name: Dan Brandano
Title:  CEO


**BUYER:**
**TRAFALGAR CAPITAL SPECIALIZED**
**INVESTMENT FUND, LUXEMBOURG**
By:      **Trafalgar Capital Sarl**
Its:     **General Partner**

By: _____
Name:  Andrew Garai
Title:   Chairman of the Board

22

## SCHEDULE I

## SCHEDULE OF BUYERS

| | | | | | |
|---|---|---|---|---|---|
| Trafalgar Capital Specialized Investment Fund, Luxembourg | By:<br>Its: | Trafalgar Capital Sarl<br>General Partner | 8-10 Rue Mathias Hardt<br>BP 3023<br>L-1030 Luxembourg<br>Facsimile:<br>011-44-207-405-0161<br>and<br>001-786-323-1651 | S | 2,400,000 |
| | By:<br>Name:<br>Its: | Andrew Garai<br>Chairman of the Board | | | |

Buyer's Counsel:

James G. Dodrill II, P.A.
5800 Hamilton Way
Boca Raton, FL 33496
Telephone: (561) 862-0529
Facsimile: (561) 892-7787

**EXHIBIT 3**

## SECURITIES PURCHASE AGREEMENT

**THIS SECURITIES PURCHASE AGREEMENT** (this "Agreement"), dated as of January 22, 2008, by and among Dynamic Leisure, Corporation, a Minnesota corporation, with headquarters located at 5680 West Cypress Street, Tampa, FL 33607 (the "Company"), and the Buyers listed on Schedule I attached hereto (individually, a "Buyer" or collectively "Buyers").

## WITNESSETH:

**WHEREAS**, the Company and the Buyer(s) are executing and delivering this Agreement in reliance upon an exemption from securities registration pursuant to Section 4(2) and/or Rule 506 of Regulation D ("Regulation D") as promulgated by the U.S. Securities and Exchange Commission (the "SEC") under the Securities Act of 1933, as amended (the "1933 Act");

**WHEREAS**, the parties desire that, upon the terms and subject to the conditions contained herein, the Company shall issue and sell to the Buyer(s), as provided herein, and the Buyer(s) shall purchase up to One Million Two Hundred Thousand Dollars ($1,200,000) of secured convertible debentures (the "Convertible Debentures"), which shall be convertible into shares of the Company's common stock, par value $.01 (the "Common Stock") (as converted, the "Conversion Shares") of which all One Million Two Hundred Thousand Dollars ($1,200,000) shall be funded on the date hereof (the "Closing"), for a total purchase price of up to One Million Two Hundred Thousand Dollars ($1,200,000), (the "Purchase Price") in the respective amounts set forth opposite each Buyer(s) name on Schedule I (the "Subscription Amount"); and

**WHEREAS**, the obligation of the Buyers to purchase Convertible Debentures in the Registration closing or the NIR Closing is subject to the Company, among other items reducing the fixed conversion price to ten cents ($0.10) on all currently executed Debentures and Warrants with the Buyers and agreeing to cause all of its other lenders to file UCC-3 statements within sixty (60) days of the date of this Agreement such that the Buyers shall receive a senior lien on all of the Company's assets and intellectual property by filing a UCC-1; and

**WHEREAS**, contemporaneously with the execution and delivery of this Agreement, the parties hereto are executing and delivering a Registration Rights Agreement substantially in the form attached hereto as Exhibit A (the "Investor Registration Rights Agreement") pursuant to which the Company has agreed to provide certain registration rights under the 1933 Act and the rules and regulations promulgated there under, and applicable state securities laws; and

**WHEREAS**, the aggregate proceeds of the sale of the Convertible Debentures contemplated hereby shall be held in escrow pursuant to the terms of an escrow agreement substantially in the form of the Escrow Agreement attached hereto as Exhibit B; and

**WHEREAS**, contemporaneously with the execution and delivery of this Agreement, the parties hereto are executing and delivering Irrevocable Transfer Agent Instructions substantially in the form attached hereto as Exhibit C (the "Irrevocable Transfer Agent Instructions"); and

**WHEREAS**, contemporaneously with the execution and delivery of this Agreement, the parties hereto are executing and delivering a Security Agreement substantially in the form attached hereto as <u>Exhibit D</u> (the "<u>Security Agreement</u>") pursuant to which the Company has agreed to provide the Buyer a security interest in Pledged Collateral (as this term is defined in the Security Agreement dated the date hereof) to secure Company's obligations under this Agreement, the Convertible Debenture, the Investor Registration Rights Agreement, the Irrevocable Transfer Agent Instructions, the Security Agreement (collectively, the "Transaction Documents") or any other obligations of the Company to the Buyer; and

**NOW, THEREFORE**, in consideration of the mutual covenants and other agreements contained in this Agreement the Company and the Buyer(s) hereby agree as follows:

  1. <u>PURCHASE AND SALE OF CONVERTIBLE DEBENTURES</u>.

    (a) <u>Purchase of Convertible Debentures</u>.  Subject to the satisfaction (or waiver) of the terms and conditions of this Agreement, each Buyer agrees, severally and not jointly, to purchase at Closing (as defined herein below) and the Company agrees to sell and issue to each Buyer, severally and not jointly, at Closing, Convertible Debentures in amounts corresponding with the Subscription Amount set forth opposite each Buyer's name on Schedule I hereto.  Upon execution hereof by a Buyer, the Buyer shall wire transfer the Subscription Amount set forth opposite his name on Schedule I in same-day funds or a check payable to "James G. Dodrill II, P.A. as Escrow Agent for Dynamic Leisure Corporation/Trafalgar Capital Investment Fund", which Subscription Amount shall be held in escrow pursuant to the terms of the Escrow Agreement (as hereinafter defined) and disbursed in accordance therewith. Notwithstanding the foregoing, a Buyer may withdraw his Subscription Amount and terminate this Agreement as to such Buyer at any time after the execution hereof and prior to the Closing (as hereinafter defined).

    (b) <u>Closing Date</u>.  The Closing of the purchase and sale of the Convertible Debentures shall take place at 10:00 a.m. Eastern Standard Time on the date hereof, subject to notification of satisfaction of the conditions to the Closing set forth herein and in Sections 6 and 7 below (or such later date as is mutually agreed to by the Company and the Buyer(s)) (the "<u>Closing Date</u>").  The Closing shall occur on the Closing Date at the offices of James G. Dodrill II, P.A., 5800 Hamilton Way, Boca Raton, FL  33496 (or such other place as is mutually agreed to by the Company and the Buyer(s)).

    (c) <u>Escrow Arrangements; Form of Payment</u>.  Upon execution hereof by Buyer(s) and pending the Closings, the aggregate proceeds of the sale of the Convertible Debentures to Buyer(s) pursuant hereto shall be deposited in a non interest bearing escrow account with James G. Dodrill II, P.A., as escrow agent (the "<u>Escrow Agent</u>"), pursuant to the terms of an escrow agreement between the Company, the Buyer(s) and the Escrow Agent in the form attached hereto as <u>Exhibit B</u> (the "<u>Escrow Agreement</u>").  Subject to the satisfaction of the terms and conditions of this Agreement, on the Closing Date, (i) the Escrow Agent shall deliver to the Company in accordance with the terms of the Escrow Agreement such aggregate proceeds for the Convertible Debentures to be issued and sold to such Buyer(s), minus the fees and expenses as set forth herein which shall be paid directly from the gross proceeds held in escrow at the Closing by wire transfer of immediately available funds and (ii) the Company shall deliver

2

to each Buyer, Convertible Debentures which such Buyer(s) is purchasing in amounts indicated opposite such Buyer's name on Schedule I, duly executed on behalf of the Company.

(d)  "Closing Date Exchange Rate" means the Euro to US dollar spot exchange rate as quoted in the London edition of the Financial Times on the Closing Date.

(e)  "Repayment Exchange Rate" means in relation to each date of a Conversion Notice or date of a Redemption Notice, the Euro to US dollar spot exchange rate as quoted in the London edition of the Financial Times on such date.

(f)  If on the date of any Conversion Notice or Redemption Notice, the Repayment Exchange Rate is less than the Closing Date Exchange Rate then the number of Shares to be issued shall be increased by the same percentage as results from dividing the Closing Date Exchange Rate by the relevant Repayment Exchange Rate. By way of example, if the number of Shares to be issued in respect of a particular Conversion Notice or Redemption Notice would, but for this Clause 1(f), be 1,000 and if the Closing Date Exchange Rate is 1.80 and the relevant Repayment Exchange Rate is 1.75, then 1,029 Shares will be issued in relation to that Conversion Notice or Redemption Notice, as the case may be.

(g)  If on the Repayment Date or any Interest Repayment Date, the Cash Payment Date Exchange Rate, as defined below is less than the Closing Date Exchange Rate then the amount of cash required to satisfy the amounts due at such time shall be increased by the same percentage as results from dividing the Closing Date Exchange Rate by the relevant Cash Payment Date Exchange Rate. "Cash Payment Date Exchange Rate" means in relation to each Repayment Date or Interest Repayment Date the Euro to US dollar spot exchange rate as quoted in the London edition of the Financial Times on such date. By way of example, if the amount of cash required to repay all amounts due on such date would, but for this Clause 1(g), be $1,000 and if the Closing Date Exchange Rate is 1.80 and the relevant Repayment Date Exchange Rate is 1.75 then the amount of cash from the Cash Payment required to repay all amounts due on such date will be $1,028.57.

## 2. BUYER'S REPRESENTATIONS AND WARRANTIES.

Each Buyer represents and warrants, severally and not jointly, that:

(a) <u>Investment Purpose</u>.  Each Buyer is acquiring the Convertible Debentures and, upon conversion of Convertible Debentures, the Buyer will acquire the Conversion Shares then issuable, for its own account for investment only and not with a view towards, or for resale in connection with, the public sale or distribution thereof, except pursuant to sales registered or exempted under the 1933 Act; provided, however, that by making the representations herein, such Buyer reserves the right to dispose of the Conversion Shares at any time in accordance with or pursuant to an effective registration statement covering such Conversion Shares or an available exemption under the 1933 Act.

(b) <u>Accredited Investor Status</u>. Each Buyer is an "<u>Accredited Investor</u>" as that term is defined in Rule 501(a)(3) of Regulation D.

3

(c) Reliance on Exemptions. Each Buyer understands that the Convertible Debentures are being offered and sold to it in reliance on specific exemptions from the registration requirements of United States federal and state securities laws and that the Company is relying in part upon the truth and accuracy of, and such Buyer's compliance with, the representations, warranties, agreements, acknowledgments and understandings of such Buyer set forth herein in order to determine the availability of such exemptions and the eligibility of such Buyer to acquire such securities.

(d) Information. Each Buyer and its advisors (and his or, its counsel), if any, have been furnished with all materials relating to the business, finances and operations of the Company and information he deemed material to making an informed investment decision regarding his purchase of the Convertible Debentures and the Conversion Shares, which have been requested by such Buyer. Each Buyer and its advisors, if any, have been afforded the opportunity to ask questions of the Company and its management. Neither such inquiries nor any other due diligence investigations conducted by such Buyer or its advisors, if any, or its representatives shall modify, amend or affect such Buyer's right to rely on the Company's representations and warranties contained in Section 3 below. Each Buyer understands that its investment in the Convertible Debentures and the Conversion Shares involves a high degree of risk. Each Buyer is in a position regarding the Company, which, based upon employment, family relationship or economic bargaining power, enabled and enables such Buyer to obtain information from the Company in order to evaluate the merits and risks of this investment. Each Buyer has sought such accounting, legal and tax advice, as it has considered necessary to make an informed investment decision with respect to its acquisition of the Convertible Debentures and the Conversion Shares.

(e) No Governmental Review. Each Buyer understands that no United States federal or state agency or any other government or governmental agency has passed on or made any recommendation or endorsement of the Convertible Debentures or the Conversion Shares, or the fairness or suitability of the investment in the Convertible Debentures or the Conversion Shares, nor have such authorities passed upon or endorsed the merits of the offering of the Convertible Debentures or the Conversion Shares.

(f) Transfer or Resale. Each Buyer understands that except as provided in the Investor Registration Rights Agreement: (i) the Convertible Debentures have not been and are not being registered under the 1933 Act or any state securities laws, and may not be offered for sale, sold, assigned or transferred unless (A) subsequently registered thereunder, or (B) such Buyer shall have delivered to the Company an opinion of counsel, in a generally acceptable form, to the effect that such securities to be sold, assigned or transferred may be sold, assigned or transferred pursuant to an exemption from such registration requirements; (ii) any sale of such securities made in reliance on Rule 144 under the 1933 Act (or a successor rule thereto) ("Rule 144") may be made only in accordance with the terms of Rule 144 and further, if Rule 144 is not applicable, any resale of such securities under circumstances in which the seller (or the person through whom the sale is made) may be deemed to be an underwriter (as that term is defined in the 1933 Act) may require compliance with some other exemption under the 1933 Act or the rules and regulations of the SEC thereunder; and (iii) neither the Company nor any other person is under any obligation to register such securities under the 1933 Act or any state securities laws or to comply with the terms and conditions of any exemption thereunder.

The Company reserves the right to place stop transfer instructions against the shares and certificates for the Conversion Shares.

(g) _Legends_.    Each Buyer understands that the certificates or other instruments representing the Convertible Debentures and or the Conversion Shares shall bear a restrictive legend in substantially the following form (and a stop transfer order may be placed against transfer of such stock certificates):

> THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS.    THE SECURITIES HAVE BEEN ACQUIRED SOLELY FOR INVESTMENT PURPOSES AND NOT WITH A VIEW TOWARD RESALE AND MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS, OR AN OPINION OF COUNSEL, GENERALLY ACCEPTABLE TO COMPANY'S COUNSEL, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT OR APPLICABLE STATE SECURITIES LAWS.

The legend set forth above shall be removed and the Company within three (3) business days shall issue a certificate without such legend to the holder of the Conversion Shares upon which it is stamped, if, unless otherwise required by state securities laws, (i) in connection with a sale transaction, provided the Conversion Shares are registered under the 1933 Act or (ii) in connection with a sale transaction, after such holder provides the Company with an opinion of counsel, which opinion shall be in form, substance and scope reasonably acceptable to counsel for the Company, to the effect that a public sale, assignment or transfer of the Conversion Shares may be made without registration under the 1933 Act.

(h) _Authorization, Enforcement_.    This Agreement has been duly and validly authorized, executed and delivered on behalf of such Buyer and is a valid and binding agreement of such Buyer enforceable in accordance with its terms, except as such enforceability may be limited by general principles of equity or applicable bankruptcy, insolvency, reorganization, moratorium, liquidation and other similar laws relating to, or affecting generally, the enforcement of applicable creditors' rights and remedies.

(i) <u>Receipt of Documents</u>. Each Buyer and his or its counsel has received and read in their entirety: (i) this Agreement and each representation, warranty and covenant set forth herein, the Security Agreement, the Investor Registration Rights Agreement, the Escrow Agreement, and the Irrevocable transfer Agent Instructions; (ii) all due diligence and other information necessary to verify the accuracy and completeness of such representations, warranties and covenants; and (iii) answers to all questions each Buyer submitted to the Company regarding an investment in the Company; and each Buyer has relied on the information contained therein and has not been furnished any other documents, literature, memorandum or prospectus.

(j) <u>Due Formation of Corporate and Other Buyers</u>. If the Buyer(s) is a corporation, trust, partnership or other entity that is not an individual person, it has been formed and validly exists and has not been organized for the specific purpose of purchasing the Convertible Debentures and is not prohibited from doing so.

(k) <u>No Legal Advice From the Company</u>. Each Buyer acknowledges, that it had the opportunity to review this Agreement and the transactions contemplated by this Agreement with his or its own legal counsel and investment and tax advisors. Each Buyer is relying solely on such counsel and advisors and not on any statements or representations of the Company or any of its representatives or agents for legal, tax or investment advice with respect to this investment, the transactions contemplated by this Agreement or the securities laws of any jurisdiction.

3.  <u>REPRESENTATIONS AND WARRANTIES OF THE COMPANY</u>.

Except as otherwise provided in the Company Disclosure Schedule delivered herewith, and except as set forth in the Company's SEC Documents filed with the Securities and Exchange Commission pursuant to the 1934 Act, the Company represents and warrants as of the date hereof and as of the Closing Date to each of the Buyers that:

(a) <u>Organization and Qualification</u>. The Company and its subsidiaries are corporations duly organized and validly existing in good standing under the laws of the jurisdiction in which they are incorporated, and have the requisite corporate power to own their properties and to carry on their business as now being conducted. Each of the Company and its subsidiaries is duly qualified as a foreign corporation to do business and is in good standing in every jurisdiction in which the nature of the business conducted by it makes such qualification necessary, except to the extent that the failure to be so qualified or be in good standing would not have a material adverse effect on the Company and its subsidiaries taken as a whole.

(b) <u>Authorization, Enforcement, Compliance with Other Instruments</u>. (i) The Company has the requisite corporate power and authority to enter into and perform this Agreement, the Security Agreement, the Investor Registration Rights Agreement, the Escrow Agreement, the Irrevocable Transfer Agent Instructions, and any related agreements, and to issue the Convertible Debentures and the Conversion Shares in accordance with the terms hereof and thereof, (ii) the execution and delivery of this Agreement, the Security Agreement, the Investor Registration Rights Agreement, the Escrow Agreement, the Irrevocable Transfer Agent Instructions (as defined herein) and any related agreements by the Company and the

consummation by it of the transactions contemplated hereby and thereby, including, without limitation, the issuance of the Convertible Debentures, the Conversion Shares and the reservation for issuance and the issuance of the Conversion Shares issuable upon conversion or exercise thereof, have been duly authorized by the Company's Board of Directors and no further consent or authorization is required by the Company, its Board of Directors or its stockholders, (iii) this Agreement, the Security Agreement, the Investor Registration Rights Agreement, the Escrow Agreement, the Irrevocable Transfer Agent Instructions and any related agreements have been duly executed and delivered by the Company, (iv) this Agreement, the Security Agreement, the Investor Registration Rights Agreement, the Escrow Agreement, the Irrevocable Transfer Agent Instructions and any related agreements constitute the valid and binding obligations of the Company enforceable against the Company in accordance with their terms, except as such enforceability may be limited by general principles of equity or applicable bankruptcy, insolvency, reorganization, moratorium, liquidation or similar laws relating to, or affecting generally, the enforcement of creditors' rights and remedies. The Company knows of no reason why the Company cannot file the registration statement as required under the Investor Registration Rights Agreement or perform any of the Company's other obligations under such documents.

(c) <u>Capitalization</u>. The authorized capital stock of the Company consists of 300,000,000 shares of Common Stock, par value $.01 per share and 20,000,000 shares of Preferred Stock. As of the date hereof, the Company has _____ shares of Common Stock and no shares of Preferred Stock issued and outstanding. All of such outstanding shares have been validly issued and are fully paid and nonassessable. No shares of Common Stock are subject to preemptive rights or any other similar rights or any liens or encumbrances suffered or permitted by the Company. As of the date of this Agreement, (i) there are no outstanding options, warrants, scrip, rights to subscribe to, calls or commitments of any character whatsoever relating to, or securities or rights convertible into, any shares of capital stock of the Company or any of its subsidiaries, or contracts, commitments, understandings or arrangements by which the Company or any of its subsidiaries is or may become bound to issue additional shares of capital stock of the Company or any of its subsidiaries or options, warrants, scrip, rights to subscribe to, calls or commitments of any character whatsoever relating to, or securities or rights convertible into, any shares of capital stock of the Company or any of its subsidiaries, (ii) there are no outstanding debt securities and (iii) there are no agreements or arrangements under which the Company or any of its subsidiaries is obligated to register the sale of any of their securities under the 1933 Act (except pursuant to the Registration Rights Agreement) and (iv) there are no outstanding registration statements and there are no outstanding comment letters from the SEC or any other regulatory agency. There are no securities or instruments containing anti-dilution or similar provisions that will be triggered by the issuance of the Convertible Debentures as described in this Agreement. The Company has furnished to the Buyer true and correct copies of the Company's Certificate of Incorporation, as amended and as in effect on the date hereof (the "<u>Certificate of Incorporation</u>"), and the Company's By-laws, as in effect on the date hereof (the "<u>By-laws</u>"), and the terms of all securities convertible into or exercisable for Common Stock and the material rights of the holders thereof in respect thereto other than stock options issued to employees and consultants.

(d) <u>Issuance of Securities</u>. The Convertible Debentures are duly authorized and, upon issuance in accordance with the terms hereof, shall be duly issued, fully

paid and nonassessable, are free from all taxes, liens and charges with respect to the issue thereof. The Conversion Shares issuable upon conversion of the Convertible Debentures have been duly authorized and reserved for issuance. Upon conversion or exercise in accordance with the Convertible Debentures the Conversion Shares will be duly issued, fully paid and nonassessable.

(e) <u>No Conflicts</u>. The execution, delivery and performance of this Agreement, the Irrevocable Transfer Agent Instructions, the Pledge Agreement and the Escrow Agreement by the Company and the consummation by the Company of the transactions contemplated hereby will not (i) result in a violation of the Articles of Incorporation or the By-laws or (ii), to the knowledge of the Company, conflict with or constitute a default (or an event which with notice or lapse of time or both would become a default) under, or give to others any rights of termination, amendment, acceleration or cancellation of, any agreement, indenture or instrument to which the Company or any of its subsidiaries is a party, or result in a violation of any law, rule, regulation, order, judgment or decree (including United States federal and state securities laws and regulations and the rules and regulations of The National Association of Securities Dealers Inc.'s OTC Bulletin Board on which the Common Shares are quoted) applicable to the Company or any of its subsidiaries or by which any property or asset of the Company or any of its subsidiaries is bound or affected. To the knowledge of the Company, neither the Company nor its subsidiaries is in violation of any term of or in default under its Articles of Incorporation or By-laws or their organizational charter or by-laws, respectively, or, any material contract, agreement, mortgage, indebtedness, indenture, instrument, judgment, decree or order or any statute, rule or regulation applicable to the Company or its subsidiaries. The business of the Company and its subsidiaries is not being conducted, and shall not be conducted in violation of any material law, ordinance, or regulation of any governmental entity. Except as specifically contemplated by this Agreement and as required under the 1933 Act and any applicable state securities laws, the Company is not required to obtain any consent, authorization or order of, or make any filing or registration with, any court or governmental agency in order for it to execute, deliver or perform any of its obligations under or contemplated by this Agreement in accordance with the terms hereof. All consents, authorizations, orders, filings and registrations which the Company is required to obtain pursuant to the preceding sentence have been obtained or effected on or prior to the date hereof, except for any required post-Closing notice filings under applicable United States federal or state securities laws, if any.

(f) <u>SEC Documents: Financial Statements</u>. Since January 13, 2006 the Company has filed or furnished, as applicable, all reports, schedules, forms, statements and other documents required to be filed by it with the SEC under of the Securities Exchange Act of 1934, as amended (the "<u>1934 Act</u>") (all of the foregoing filed prior to the date hereof or amended after the date hereof and all exhibits included therein and financial statements and schedules thereto and documents incorporated by reference therein, being hereinafter referred to as the "<u>SEC Documents</u>"). The Company has delivered to the Buyers or their representatives, or made available through the SEC's website at http://www.sec.gov, true and complete copies of the SEC Documents. As of their respective dates, the financial statements of the Company disclosed in the SEC Documents (the "<u>Financial Statements</u>") complied as to form in all material respects with applicable accounting requirements and the published rules and regulations of the SEC with respect thereto. Such financial statements have been prepared in accordance with U.S. generally accepted accounting principles, consistently applied, during the periods involved (except (i) as

may be otherwise indicated in such Financial Statements or the notes thereto, or (ii) in the case of unaudited interim statements, to the extent they may exclude footnotes or may be condensed or summary statements) and, fairly present in all material respects the financial position of the Company as of the dates thereof and the results of its operations and cash flows for the periods then ended (subject, in the case of unaudited statements, to normal year-end audit adjustments).

(g)  No Material Misstatement or Omission.  None of the Company's SEC Documents at the time of filing and none of the representation and warranties made in this Agreement or any of the other  Transaction Documents include any untrue statements of material fact, nor do the Company's SEC Documents at the time of filing and none of the representations and warranties made in this Agreement or any of the other Transaction Documents omit to state any material fact required to be stated therein necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

(h)  Absence of Litigation.  There is no action, suit, proceeding, inquiry or investigation before or by any court, public board, government agency, self-regulatory organization or body pending against or affecting the Company, the Common Stock or any of the Company's subsidiaries, wherein an unfavorable decision, ruling or finding would (i) have a material adverse effect on the transactions contemplated hereby (ii) adversely affect the validity or enforceability of, or the authority or ability of the Company to perform its obligations under, this Agreement or any of the documents contemplated herein, or (iii) except as expressly disclosed in the SEC Documents, have a material adverse effect on the business, operations, properties, financial condition or results of operations of the Company and its subsidiaries taken as a whole.

(i)  Acknowledgment Regarding Buyer's Purchase of the Convertible Debentures.  The Company acknowledges and agrees that the Buyer(s) is acting solely in the capacity of an arm's length purchaser with respect to this Agreement and the transactions contemplated hereby.  The Company further acknowledges that the Buyer(s) is not acting as a financial advisor or fiduciary of the Company (or in any similar capacity) with respect to this Agreement and the transactions contemplated hereby and any advice given by the Buyer(s) or any of their respective representatives or agents in connection with this Agreement and the transactions contemplated hereby is merely incidental to such Buyer's purchase of the Convertible Debentures or the Conversion Shares.  The Company further represents to the Buyer that the Company's decision to enter into this Agreement has been based solely on the independent evaluation by the Company and its representatives.

(j)  No General Solicitation.  Neither the Company, nor any of its affiliates, nor any person acting on its or their behalf, has engaged in any form of general solicitation or general advertising (within the meaning of Regulation D under the 1933 Act) in connection with the offer or sale of the Convertible Debentures or the Conversion Shares.

(k)  No Integrated Offering.  Neither the Company, nor any of its affiliates, nor any person acting on its or their behalf has, directly or indirectly, made any offers or sales of any security or solicited any offers to buy any security, under circumstances that would require registration of the Convertible Debentures or the Conversion Shares under the 1933 Act or cause

this offering of the Convertible Debentures or the Conversion Shares to be integrated with prior offerings by the Company for purposes of the 1933 Act.

(l) Employee Relations. Neither the Company nor any of its subsidiaries is involved in any labor dispute nor, to the knowledge of the Company or any of its subsidiaries, is any such dispute threatened. None of the Company's or its subsidiaries' employees is a member of a union and the Company and its subsidiaries believe that their relations with their employees are good.

(m) Intellectual Property Rights. The Company and its subsidiaries own or possess adequate rights or licenses to use all trademarks, trade names, service marks, service mark registrations, service names, patents, patent rights, copyrights, inventions, licenses, approvals, governmental authorizations, trade secrets and rights necessary to conduct their respective businesses as now conducted. The Company and its subsidiaries do not have any knowledge of any infringement by the Company or its subsidiaries of trademark, trade name rights, patents, patent rights, copyrights, inventions, licenses, service names, service marks, service mark registrations, trade secret or other similar rights of others, and, to the knowledge of the Company there is no claim, action or proceeding being made or brought against, or to the Company's knowledge, being threatened against, the Company or its subsidiaries regarding trademark, trade name, patents, patent rights, invention, copyright, license, service names, service marks, service mark registrations, trade secret or other infringement; and the Company and its subsidiaries are unaware of any facts or circumstances which might give rise to any of the foregoing.

(n) Environmental Laws. The Company and its subsidiaries are (i) in compliance with any and all applicable foreign, federal, state and local laws and regulations relating to the protection of human health and safety, the environment or hazardous or toxic substances or wastes, pollutants or contaminants ("Environmental Laws"), (ii) have received all permits, licenses or other approvals required of them under applicable Environmental Laws to conduct their respective businesses and (iii) are in compliance with all terms and conditions of any such permit, license or approval.

(o) Title. Any real property and facilities held under lease by the Company and its subsidiaries are held by them under valid, subsisting and enforceable leases with such exceptions as are not material and do not interfere with the use made and proposed to be made of such property and buildings by the Company and its subsidiaries.

(p) Insurance. The Company and each of its subsidiaries are insured by insurers of recognized financial responsibility against such losses and risks and in such amounts as management of the Company believes to be prudent and customary in the businesses in which the Company and its subsidiaries are engaged. Neither the Company nor any such subsidiary has been refused any insurance coverage sought or applied for and neither the Company nor any such subsidiary has any reason to believe that it will not be able to renew its existing insurance coverage as and when such coverage expires or to obtain similar coverage from similar insurers as may be necessary to continue its business at a cost that would not materially and adversely affect the condition, financial or otherwise, or the earnings, business or operations of the Company and its subsidiaries, taken as a whole.

(q) <u>Regulatory Permits</u>.  The Company and its subsidiaries possess all material certificates, authorizations and permits issued by the appropriate federal, state or foreign regulatory authorities necessary to conduct their respective businesses, and neither the Company nor any such subsidiary has received any notice of proceedings relating to the revocation or modification of any such certificate, authorization or permit.

(r) <u>Internal Accounting Controls</u>.  The Company and each of its subsidiaries maintain a system of internal accounting controls sufficient to provide reasonable assurance that (i) transactions are executed in accordance with management's general or specific authorizations, (ii) transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles and to maintain asset accountability, and (iii) the recorded amounts for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

(s) <u>No Material Adverse Breaches, etc</u>.  Neither the Company nor any of its subsidiaries is subject to any charter, corporate or other legal restriction, or any judgment, decree, order, rule or regulation which in the judgment of the Company's officers has or is expected in the future to have a material adverse effect on the business, properties, operations, financial condition, results of operations or prospects of the Company or its subsidiaries.  Neither the Company nor any of its subsidiaries is in breach of any contract or agreement which breach, in the judgment of the Company's officers, has or is expected to have a material adverse effect on the business, properties, operations, financial condition, results of operations or prospects of the Company or its subsidiaries.

(t) <u>Tax Status</u>.  The Company and each of its subsidiaries has made and filed all federal and state income and all other tax returns, reports and declarations required by any jurisdiction to which it is subject and (unless and only to the extent that the Company and each of its subsidiaries has set aside on its books provisions reasonably adequate for the payment of all unpaid and unreported taxes) has paid all taxes and other governmental assessments and charges that are material in amount, shown or determined to be due on such returns, reports and declarations, except those being contested in good faith and has set aside on its books provision reasonably adequate for the payment of all taxes for periods subsequent to the periods to which such returns, reports or declarations apply.  There are no unpaid taxes in any material amount claimed to be due by the taxing authority of any jurisdiction, and the officers of the Company know of no basis for any such claim.

(u) <u>Certain Transactions</u>.  Except for arm's length transactions pursuant to which the Company makes payments in the ordinary course of business upon terms no less favorable than the Company could obtain from third parties and other than the grant of stock options disclosed in the SEC Documents, none of the officers, directors, or employees of the Company is presently a party to any transaction with the Company (other than for services as employees, officers and directors), including any contract, agreement or other arrangement providing for the furnishing of services to or by, providing for rental of real or personal property to or from, or otherwise requiring payments to or from any officer, director or such employee or, to the knowledge of the Company, any corporation, partnership, trust or other entity in which any officer, director, or any such employee has a substantial interest or is an officer, director, trustee or partner.

(v) <u>Fees and Rights of First Refusal</u>.  The Company is not obligated to offer the securities offered hereunder on a right of first refusal basis or otherwise to any third parties including, but not limited to, current or former shareholders of the Company, underwriters, brokers, agents or other third parties.

4.  <u>COVENANTS</u>.

(a) <u>Best Efforts</u>.  Each party shall use its best efforts timely to satisfy each of the conditions to be satisfied by it as provided in Sections 6 and 7 of this Agreement.

(b) <u>Form D</u>.  The Company agrees to file a Form D with respect to the Conversion Shares as required under Regulation D and to provide a copy thereof to each Buyer promptly after such filing. The Company shall, on or before the Closing Date, take such action as the Company shall reasonably determine is necessary to qualify the Conversion Shares, or obtain an exemption for the Conversion Shares for sale to the Buyers at the Closing pursuant to this Agreement under applicable securities or "Blue Sky" laws of the states of the United States, and shall provide evidence of any such action so taken to the Buyers on or prior to the Closing Date.

(c) <u>Reporting Status</u>.  Until the earlier of (i) the date as of which the Buyer(s) may sell all of the Conversion Shares without restriction pursuant to Rule 144(k) promulgated under the 1933 Act (or successor thereto), or (ii) the date on which (A) the Buyer(s) shall have sold all the Conversion Shares and (B) none of the Convertible Debentures are outstanding (the "<u>Registration Period</u>"), the Company shall file in a timely manner all reports required to be filed with the SEC pursuant to the 1934 Act and the regulations of the SEC thereunder, and the Company shall not terminate its status as an issuer required to file reports under the 1934 Act even if the 1934 Act or the rules and regulations thereunder would otherwise permit such termination.

(d) <u>Use of Proceeds</u>.  The Company will use $200,000 of the proceeds from the sale of the Convertible Debentures for the purpose of acquiring Bravo Travel and the remainder of the proceeds from the sale of the Convertible Debentures for working capital purposes.

(e) <u>Reservation of Shares</u>.  The Company shall take all action reasonably necessary to at all times have authorized, and reserved for the purpose of issuance, such number of shares of Common Stock as shall be necessary to effect the issuance of the Conversion Shares and the issuance of the shares upon exercise of the Warrants (as defined below).  If at any time the Company does not have available such shares of Common Stock as shall from time to time be sufficient to effect the conversion of all of the Conversion Shares of the Company or the issuance of all shares upon exercise of the Warrants, the Company shall file a preliminary proxy statement with the Securities and Exchange Commission within ten (10) business day and shall call and hold a special meeting of the shareholders as soon as practicable after such occurrence, for the sole purpose of increasing the number of shares authorized.  The Company's management shall recommend to the shareholders to vote in favor of increasing the number of shares of Common Stock authorized.  Management shall also vote all of its shares in favor of increasing the number of authorized shares of Common Stock.

(f) <u>Fees and Expenses</u>.

(i)     Each of the Company and the Buyer(s) shall pay all costs and expenses incurred by such party in connection with the negotiation, investigation, preparation, execution and delivery of this Agreement, the Escrow Agreement, the Investor Registration Rights Agreement, the Security Agreement and the Irrevocable Transfer Agent Instructions and any other documents relating to this transaction.

(ii)     The Company has agreed to pay a structuring fee to Buyer of Seventeen Thousand Five Hundred Dollars ($17,500), which shall be paid directly from the proceeds of the Closing.

(iii)     The Company shall issue to the Buyer warrants to purchase up to fifteen million (15,000,000) shares of the Company's Common Stock for a period of five (5) years at an exercise price equal to Closing one tenth of one cent ($.001) ("<u>Warrants</u>"). The Warrants shall be issued in full at the Closing and shall be exercised on a cash basis provided that the Company is not in Default and the shares underlying the Warrants are subject to an effective registration statement. In the event that the Purchase Price is not paid in full the Warrants shall be reduced proportionally.

(iv)     The Company shall pay to the Buyer a Commitment Fee equal to ten percent (10%) of the Purchase Price which shall be paid directly from the proceeds the Closing.

(g) <u>Corporate Existence</u>.  So long as any of the Convertible Debentures remain outstanding, the Company shall not directly or indirectly consummate any merger, reorganization, restructuring, reverse stock split consolidation, sale of all or substantially all of the Company's assets or any similar transaction or related transactions (each such transaction, an "<u>Organizational Change</u>") unless, prior to the consummation an Organizational Change, the Company obtains the written consent of each Buyer.  In any such case, the Company will make appropriate provision with respect to such holders' rights and interests to insure that the provisions of this Section 4(g) will thereafter be applicable to the Convertible Debentures.

(h) <u>Transactions With Affiliates</u>.  So long as any Convertible Debentures are outstanding, the Company shall not, and shall cause each of its subsidiaries not to, enter into, amend, modify or supplement, or permit any subsidiary to enter into, amend, modify or supplement any agreement, transaction, commitment, or arrangement with any of its or any subsidiary's officers, directors, persons who were officers or directors at any time during the previous two (2) years, stockholders who beneficially own five percent (5%) or more of the Common Stock, or Affiliates (as defined below) or with any individual related by blood, marriage, or adoption to any such individual or with any entity in which any such entity or individual owns a five percent (5%) or more beneficial interest (each a "<u>Related Party</u>"), except for (a) customary employment arrangements and benefit programs on reasonable terms, (b) any investment in an Affiliate of the Company,  (c) any agreement, transaction, commitment, or arrangement on an arms-length basis on terms no less favorable than terms which would have

been obtainable from a person other than such Related Party, (d) any agreement transaction, commitment, or arrangement which is approved by a majority of the disinterested directors of the Company, for purposes hereof, any director who is also an officer of the Company or any subsidiary of the Company shall not be a disinterested director with respect to any such agreement, transaction, commitment, or arrangement. "Affiliate" for purposes hereof means, with respect to any person or entity, another person or entity that, directly or indirectly, (i) has a ten percent (10%) or more equity interest in that person or entity, (ii) has ten percent (10%) or more common ownership with that person or entity, (iii) controls that person or entity, or (iv) shares common control with that person or entity. "Control" or "controls" for purposes hereof means that a person or entity has the power, direct or indirect, to conduct or govern the policies of another person or entity.

(i) Transfer Agent. The Company covenants and agrees that, in the event that the Company's agency relationship with the transfer agent should be terminated for any reason prior to a date which is two (2) years after the Closing Date, the Company shall immediately appoint a new transfer agent and shall require that the new transfer agent execute and agree to be bound by the terms of the Irrevocable Transfer Agent Instructions (as defined herein).

(j)     Restriction on Issuance of the Capital Stock. So long as any Convertible Debentures are outstanding, the Company shall not, without the prior written consent of the Buyer(s), (i) issue or sell shares of Common Stock or Preferred Stock without consideration or for a consideration per share less than the bid price of the Common Stock determined immediately prior to its issuance, (ii) issue any preferred stock, warrant, option, right, contract, call, or other security instrument granting the holder thereof, the right to acquire Common Stock without consideration or for a consideration less than such Common Stock's bid price value determined immediately prior to it's issuance, (iii) enter into any security instrument granting the holder a security interest in any and all assets of the Company, or (iv) file any registration statement on Form S-8.

(k)     Restriction on "Short" Position. Neither the Buyer nor any of its affiliates have an open short position in the Common Stock of the Company, and the Buyer agrees that it shall not, and that it will cause its affiliates not to, engage in any short sales with respect to the Common Stock as long as any Convertible Debentures shall remain outstanding.

5. TRANSFER AGENT INSTRUCTIONS.

The Company shall issue the Irrevocable Transfer Agent Instructions to its transfer agent irrevocably appointing James G. Dodrill II, P.A. as its agent for purpose of having certificates issued, registered in the name of the Buyer(s) or its respective nominee(s), for the Conversion Shares representing such amounts of Convertible Debentures as specified from time to time by the Buyer(s) to the Company upon conversion of the Convertible Debentures, for interest owed pursuant to the Convertible Debenture, and for any and all Liquidated Damages (as this term is defined in the Investor Registration Rights Agreement). James G. Dodrill II, P.A. shall be paid a cash fee of One Hundred Dollars ($100) for every occasion they act pursuant to the Irrevocable Transfer Agent Instructions. The Company shall not change its transfer agent without the express written consent of the Buyer(s), which may be withheld by the Buyer(s) in its sole

discretion. Prior to registration of the Conversion Shares under the 1933 Act, all such certificates shall bear the restrictive legend specified in Section 2(g) of this Agreement. The Company warrants that no instruction other than the Irrevocable Transfer Agent Instructions referred to in this Section 5, and stop transfer instructions to give effect to Section 2(g) hereof (in the case of the Conversion Shares prior to registration of such shares under the 1933 Act) will be given by the Company to its transfer agent and that the Conversion Shares shall otherwise be freely transferable on the books and records of the Company as and to the extent provided in this Agreement and the Investor Registration Rights Agreement. Nothing in this Section 5 shall affect in any way the Buyer's obligations and agreement to comply with all applicable securities laws upon resale of Conversion Shares. If the Buyer(s) provides the Company with an opinion of counsel, in form, scope and substance customary for opinions of counsel in comparable transactions and reasonably acceptable to the Company's counsel, to the effect that registration of a resale by the Buyer(s) of any of the Conversion Shares is not required under the 1933 Act, the Company shall within two (2) business days instruct its transfer agent to issue one or more certificates in such name and in such denominations as specified by the Buyer. The Company acknowledges that a breach by it of its obligations hereunder will cause irreparable harm to the Buyer by vitiating the intent and purpose of the transaction contemplated hereby. Accordingly, the Company acknowledges that the remedy at law for a breach of its obligations under this Section 5 will be inadequate and agrees, in the event of a breach or threatened breach by the Company of the provisions of this Section 5, that the Buyer(s) shall be entitled, in addition to all other available remedies, to an injunction restraining any breach and requiring immediate issuance and transfer, without the necessity of showing economic loss and without any bond or other security being required.

6.  <u>CONDITIONS TO THE COMPANY'S OBLIGATION TO SELL</u>.

The obligation of the Company hereunder to issue and sell the Convertible Debentures to the Buyer(s) at the Closings is subject to the satisfaction, at or before the Closing Date, of each of the following conditions, provided that these conditions are for the Company's sole benefit and may be waived by the Company at any time in its sole discretion:

(a) Each Buyer shall have executed this Agreement, the Security Agreement, the Escrow Agreement and the Investor Registration Rights Agreement and the Irrevocable Transfer Agent Instructions and delivered the same to the Company.

(b) The Buyer(s) shall have delivered to the Escrow Agent the Purchase Price for Convertible Debentures in respective amounts as set forth next to each Buyer as outlined on Schedule I attached hereto and the Escrow Agent shall have delivered the net proceeds to the Company by wire transfer of immediately available U.S. funds pursuant to the wire instructions provided by the Company.

(c) The representations and warranties of the Buyer(s) shall be true and correct in all material respects as of the date when made and as of the Closing Date as though made at that time (except for representations and warranties that speak as of a specific date), and the Buyer(s) shall have performed, satisfied and complied in all material respects with the covenants, agreements and conditions required by this Agreement to be performed, satisfied or complied with by the Buyer(s) at or prior to the Closing Date.

15

(d) The Company shall have filed a form UCC-1 with regard to the Pledged Property and Pledged Collateral as detailed in the Security Agreement dated the date hereof and provided proof of such filing to the Buyer(s).

7. <u>CONDITIONS TO THE BUYER'S OBLIGATION TO PURCHASE</u>.

The obligation of the Buyer(s) hereunder to purchase the Convertible Debentures at the Closing is subject to the satisfaction, at or before the Closing Date, of each of the following conditions:

(a) The Company shall have executed this Agreement, the Security Agreement, the Convertible Debenture, the Escrow Agreement, the Irrevocable Transfer Instructions, the Warrant and the Investor Registration Rights Agreement, and delivered the same to the Buyer(s).

(b) The trading in the Common Shares on the OTCBB shall not have been suspended for any reason.

(c) The representations and warranties of the Company shall be true and correct in all material respects (except to the extent that any of such representations and warranties is already qualified as to materiality in Section 3 above, in which case, such representations and warranties shall be true and correct without further qualification) as of the date when made and as of the Closing Date as though made at that time (except for representations and warranties that speak as of a specific date) and the Company shall have performed, satisfied and complied in all material respects with the covenants, agreements and conditions required by this Agreement to be performed, satisfied or complied with by the Company at or prior to the Closing Date.  If requested by the Buyer, the Buyer shall have received a certificate, executed by the President of the Company, dated as of the Closing Date, to the foregoing effect and as to such other matters as may be reasonably requested by the Buyer including, without limitation an update as of the Closing Date regarding the representation contained in Section 3(c) above.

(d) The Company shall have executed and delivered to the Buyer(s) the Convertible Debentures in the respective amounts set forth opposite each Buyer(s) name on Schedule I attached hereto.

(e) Within sixty (60) days of the date of this Agreement, the Buyer(s) shall have received an opinion of counsel from counsel to the Company in a form satisfactory to the Buyer(s).

(f) The Company shall have provided to the Buyer(s) a certificate of good standing from the secretary of state from the state in which the company is incorporated.

(g) As of the Closing Date, the Company shall have reserved out of its authorized and unissued Common Stock, solely for the purpose of effecting the conversion of the Convertible Debentures, shares of Common Stock to effect the conversion of all of the Conversion Shares then outstanding.

16

(h) The Irrevocable Transfer Agent Instructions, in form and substance satisfactory to the Buyer, shall have been delivered to and acknowledged in writing by the Company's transfer agent.

(i) The Company shall have provided to the Buyer an acknowledgement, to the satisfaction of the Buyer, from the Company's independent certified public accountants as to its ability to provide all consents required in order to file a registration statement in connection with this transaction.

(j) The Company shall cause each of its other lenders to file a Form UCC-3 within sixty (60) days of the date of this Agreement and the Company shall file a form UCC-1 or such other forms as may be required to perfect the Buyer's interest in the Pledged Collateral as detailed in the Security Agreement dated the date hereof, providing the Buyer with a senior lien on all of the Company's assets and intellectual property and provided proof of such filing to the Buyer(s).

(k) The satisfactorily completion of all due diligence, including due diligence relating to the acquisition of Bravo Travel.

(l) The Company shall issue shares to its Chief Executive Officer such that his equity position is not less than ten million (10,000,000) shares.

(m) The Company shall take all necessary steps such that the Buyer shall have the ability to appoint one member to the Company's Board of Directors.

(n) The Company agrees to reduce the fixed conversion price to ten cents ($0.10) on all currently executed Convertible Debentures held by the Buyer and the exercise price to ten cents ($0.10) on all currently executed Warrants held by the Buyer.

8. INDEMNIFICATION.

(a) In consideration of the Buyer's execution and delivery of this Agreement and acquiring the Convertible Debentures and the Conversion Shares hereunder, and in addition to all of the Company's other obligations under this Agreement, the Company shall defend, protect, indemnify and hold harmless the Buyer(s) and each other holder of the Convertible Debentures and the Conversion Shares, and all of their officers, directors, employees and agents (including, without limitation, those retained in connection with the transactions contemplated by this Agreement) (collectively, the "Buyer Indemnitees") from and against any and all actions, causes of action, suits, claims, losses, costs, penalties, fees, liabilities and damages, and expenses in connection therewith (irrespective of whether any such Buyer Indemnitee is a party to the action for which indemnification hereunder is sought), and including reasonable attorneys' fees and disbursements (the "Indemnified Liabilities"), incurred by the Buyer Indemnitees or any of them as a result of, or arising out of, or relating to (a) any misrepresentation or breach of any representation or warranty made by the Company in this Agreement, the Convertible Debentures or the Investor Registration Rights Agreement or any other certificate, instrument or document contemplated hereby or thereby, (b) any breach of any covenant, agreement or obligation of the Company contained in this Agreement, or the Investor Registration Rights Agreement or any other certificate, instrument or document contemplated

hereby or thereby, or (c) any cause of action, suit or claim brought or made against such Indemnitee by a third party and arising out of or resulting from the execution, delivery, performance or enforcement of this Agreement or any other instrument, document or agreement executed pursuant hereto by any of the Indemnities, any transaction financed or to be financed in whole or in part, directly or indirectly, with the proceeds of the issuance of the Convertible Debentures or the status of the Buyer or holder of the Convertible Debentures  the Conversion Shares,  as a Buyer of Convertible Debentures in the Company.  To the extent that the foregoing undertaking by the Company may be unenforceable for any reason, the Company shall make the maximum contribution to the payment and satisfaction of each of the Indemnified Liabilities, which is permissible under applicable law.

(b) In consideration of the Company's execution and delivery of this Agreement, and in addition to all of the Buyer's other obligations under this Agreement, the Buyer shall defend, protect, indemnify and hold harmless the Company and all of its officers, directors, employees and agents (including, without limitation, those retained in connection with the transactions contemplated by this Agreement) (collectively, the "Company Indemnitees") from and against any and all Indemnified Liabilities incurred by the Indemnitees or any of them as a result of, or arising out of, or relating to (a) any misrepresentation or breach of any representation or warranty made by the Buyer(s) in this Agreement, the Convertible Debentures or the Investor Registration Rights Agreement or any other certificate, instrument or document contemplated hereby or thereby executed by the Buyer, (b) any breach of any covenant, agreement or obligation of the Buyer(s) contained in this Agreement, the Convertible Debentures, the Investor Registration Rights Agreement or any other certificate, instrument or document contemplated hereby or thereby executed by the Buyer, or (c) any cause of action, suit or claim brought or made against such Company Indemnitee based on material misrepresentations or due to a material breach and arising out of or resulting from the execution, delivery, performance or enforcement of this Agreement, the Convertible Debentures, the Investor Registration Rights Agreement or any other certificate instrument, document or agreement executed pursuant hereto by any of the Company Indemnities.  To the extent that the foregoing undertaking by each Buyer may be unenforceable for any reason, each Buyer shall make the maximum contribution to the payment and satisfaction of each of the Indemnified Liabilities, which is permissible under applicable law.

9.    GOVERNING LAW: MISCELLANEOUS.

(a) Governing Law.  This Agreement shall be governed by and interpreted in accordance with the laws of the State of Florida without regard to the principles of conflict of laws.  The parties further agree that any action between them shall be heard in Broward County, Florida and expressly consent to the jurisdiction and venue of the State Court sitting in Broward County, Florida and the United States District Court for the Southern District of Florida for the adjudication of any civil action asserted pursuant to this Paragraph.

(b) Counterparts.  This Agreement may be executed in two or more identical counterparts, all of which shall be considered one and the same agreement and shall become effective when counterparts have been signed by each party and delivered to the other party.  In the event any signature page is delivered by facsimile transmission, the party using

such means of delivery shall cause four (4) additional original executed signature pages to be physically delivered to the other party within five (5) days of the execution and delivery hereof.

(c) <u>Headings</u>.  The headings of this Agreement are for convenience of reference and shall not form part of, or affect the interpretation of, this Agreement.

(d) <u>Severability</u>.  If any provision of this Agreement shall be invalid or unenforceable in any jurisdiction, such invalidity or unenforceability shall not affect the validity or enforceability of the remainder of this Agreement in that jurisdiction or the validity or enforceability of any provision of this Agreement in any other jurisdiction.

(e) <u>Entire Agreement, Amendments</u>.  This Agreement supersedes all other prior oral or written agreements between the Buyer(s), the Company, their affiliates and persons acting on their behalf with respect to the matters discussed herein, and this Agreement and the instruments referenced herein contain the entire understanding of the parties with respect to the matters covered herein and therein and, except as specifically set forth herein or therein, neither the Company nor any Buyer makes any representation, warranty, covenant or undertaking with respect to such matters.  No provision of this Agreement may be waived or amended other than by an instrument in writing signed by the party to be charged with enforcement.

(f) <u>Notices</u>.  Any notices, consents, waivers, or other communications required or permitted to be given under the terms of this Agreement must be in writing and will be deemed to have been delivered (i) upon receipt, when delivered personally; (ii) upon confirmation of receipt, when sent by facsimile; (iii) three (3) days after being sent by U.S. certified mail, return receipt requested, or (iv) one (1) day after deposit with a nationally recognized overnight delivery service, in each case properly addressed to the party to receive the same.  The addresses and facsimile numbers for such communications shall be:

If to the Company, to:

Dynamic Leisure Corporation
5680 West Cypress Street
Tampa, FL  33607
Attention:  Mr. Dan Brandano, CEO
Telephone: (813) 877-6300
Facsimile: (813) 877-6333

With a copy to:

Crone Rozynko LLP
101 Montgomery Street
Suite 1950
San Francisco CA  94104-4154
Attn:  Alisande M. Rozynko, Partner
Telephone: (415) 955-8900
Facsimile: (415) 955-8910

If to the Transfer Agent, to:        Bob Winterle, VP Operations
StockTrans, Inc.

44 W. Lancaster Ave
Ardmore, PA 19003
Telephone: (610) 649-7300
Facsimile: (610) 649-7302

With Copy to:        James G. Dodrill II, P.A.
5800 Hamilton Way
Boca Raton, FL 33496
Attention:    Jim Dodrill, Esq.
Telephone:   (561) 862-0529
Facsimile:    (561) 892-7787

If to the Buyer(s), to its address and facsimile number on Schedule I, with copies to the Buyer's counsel as set forth on Schedule I. Each party shall provide five (5) days' prior written notice to the other party of any change in address or facsimile number.

(g) <u>Successors and Assigns</u>. This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and assigns. Neither the Company nor any Buyer shall assign this Agreement or any rights or obligations hereunder without the prior written consent of the other party hereto.

(h) <u>No Third Party Beneficiaries</u>. This Agreement is intended for the benefit of the parties hereto and their respective permitted successors and assigns, and is not for the benefit of, nor may any provision hereof be enforced by, any other person.

(i) <u>Survival</u>. Unless this Agreement is terminated under Section 9(l), the representations and warranties of the Company and the Buyer(s) contained in Sections 2 and 3, the agreements and covenants set forth in Sections 4, 5 and 9, and the indemnification provisions set forth in Section 8, shall survive the Closing for a period of two (2) years following the date on which the Convertible Debentures are converted in full. The Buyer(s) shall be responsible only for its own representations, warranties, agreements and covenants hereunder.

(j) <u>Publicity</u>. The Company and the Buyer(s) shall have the right to approve, before issuance any press release or any other public statement with respect to the transactions contemplated hereby made by any party; provided, however, that the Company shall be entitled, without the prior approval of the Buyer(s), to issue any press release or other public disclosure with respect to such transactions required under applicable securities or other laws or regulations (the Company shall use its best efforts to consult the Buyer(s) in connection with any such press release or other public disclosure prior to its release and Buyer(s) shall be provided with a copy thereof upon release thereof).

(k) <u>Further Assurances</u>. Each party shall do and perform, or cause to be done and performed, all such further acts and things, and shall execute and deliver all such other agreements, certificates, instruments and documents, as the other party may reasonably request

in order to carry out the intent and accomplish the purposes of this Agreement and the consummation of the transactions contemplated hereby.

(l) <u>Termination</u>. In the event that the Closing shall not have occurred with respect to the Buyers on or before five (5) business days from the date hereof due to the Company's or the Buyer's failure to satisfy the conditions set forth in Sections 6 and 7 above (and the non-breaching party's failure to waive such unsatisfied condition(s)), the non-breaching party shall have the option to terminate this Agreement with respect to such breaching party at the close of business on such date without liability of any party to any other party; provided, however, that if this Agreement is terminated by the Company pursuant to this Section 9(l), the Company shall remain obligated to pay the Buyer(s) for the structuring fee described in Section 4(g) above.

(m) <u>No Strict Construction</u>. The language used in this Agreement will be deemed to be the language chosen by the parties to express their mutual intent, and no rules of strict construction will be applied against any party.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

**IN WITNESS WHEREOF**, the Buyers and the Company have caused this Securities Purchase Agreement to be duly executed as of the date first written above.

**COMPANY:**
**DYNAMIC LEISURE CORPORATION**

By:_____
Name: Dan Brandano
Title:  CEO


**BUYER:**
**TRAFALGAR CAPITAL SPECIALIZED**
**INVESTMENT FUND, LUXEMBOURG**
**By:      Trafalgar Capital Sarl**
**Its:      General Partner**

By: _____
Name:  Andrew Garai
Title:   Chairman of the Board

22

**EXHIBIT A**

<u>**FORM OF INVESTOR REGISTRATION RIGHTS AGREEMENT**</u>

**EXHIBIT B**

## FORM OF ESCROW AGREEMENT

**EXHIBIT C**

## TRANSFER AGENT INSTRUCTIONS

## SCHEDULE I

## SCHEDULE OF BUYERS

| Name | Signature | | Address/Facsimile Number of Buyer | Amount of Subscription |
|------|-----------|---|-----------------------------------|------------------------|
| Trafalgar Capital Specialized Investment Fund, Luxembourg | By: Its: | Trafalgar Capital Sarl General Partner | 8-10 Rue Mathias Hardt BP 3023 L-1030 Luxembourg Facsimile: 011-44-207-405-0161 and 001-786-323-1651 | $    2,400,000 |
| | By:_____ Name: Its: | Andrew Garai Chairman of the Board | | |

Buyer's Counsel:

James G. Dodrill II, P.A.
5800 Hamilton Way
Boca Raton, FL  33496
Telephone: (561) 862-0529
Facsimile: (561) 892-7787

**EXHIBIT 4**

```
  1-29-2008                Checking Account Inquiry              20-0700-4D
 12:04:10                   Detail History Data                  MAJ82650B1
```

Account number: 7600586048    Short name: DYNAMIC LEISURE CO

```
     *--------------------Detail Information--------------------*
      Posting date julian/calendar:        2008025 /  1-25-08
      Effective date julian/calendar:      2008025 /  1-25-08
      Transaction number within day:                         1
      DR/CR code:                                            1
      Posting/internal/original tran code:   21 /  21 /  21
      Transaction amount:                        800,831.20
      Serial/check number:
      Str/run/bat/seq#:              00/949/0000048/0008710/01
      Quantity for this transaction:                        1
      Passbook/reversal flag:                               /
      Substitute check flag:
      Source of transaction/user ID:          G /    SYSTEM
      Description of transaction:  INCOMING WIRE TRANSFER
                                   JAMES G. DODRILL II, P.A.
```

F3=Exit   F15=Restart

**From:** Daniel Brandano
**To:** skornhauser@earthlink.net
**Date:** 1/29/2008 11:31:38 AM
**Subject:** FW: Pdf of Trafalgar Wire

---

Sam,
attached is a print out from Mercantile Bank on the
account of Dynamic Leisure.
note that on the 25th the wire arrived from
James Dodrill II, P.A. the atty and escrow agent
for Trafalgar. This is the net proceeds from the
1 Million Dollar debenture (800,831.20). Deductions were
prepaid interest, legal and other fees and expenses
owed to Trafalgar. The other 200,000 Debenture
(total 1.2 million) is as per the agreement held in escrow
for a follow on transaction in the U.K.
I will have the balance sheet pdf shortly


Dan Brandano
Dynamic Leisure Corporation
Bay West Commerce Park
5680 West Cypress Street
Tampa, Florida 33607 USA
Tel: 813-877-6300Fax: 813-877-6333
Cell: 727-742-7003

PRIVILEGE AND CONFIDENTIALITY NOTICE
The information in this electronic mail is intended for named
recipients only. It may contain privileged or confidential matter.
If you received this mail in error please contact the sender
immediately.




>From: "Mark Lightsey" <mark.lightsey@dylicorp.com>
>To: "Dan Brandano" <dan.brandano@dylicorp.com>,"Dan Brandano"
><Dbrandano@hotmail.com>
>Subject: Pdf of Trafalgar Wire
>Date: Tue, 29 Jan 2008 14:04:19 -0500
>
>Dan:
>
>Please see attached
>
>
>Mark D. Lightsey
>
>VP Finance/ Controller
>
>Dynamic Leisure Corporation, Inc.
>
>Ph: 813.877.6300 Ext 224
>
>E-Mail: mark.lightsey@dylicorp.com
>
>
>
>
>